UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REGIONS BANK,

        Plaintiff,

v.                                 CASE NO.  8:09-CV-1841-T-17MAP

LARRY S. HYMAN, assignee
for G3 Tampa, LLC, etc.,
BING CHARLES W. KEARNEY,
JR., BRIAN SEEGER, TRACY
J. HARRIS, JR., and GREGORY
BENNETT,

        Defendants.

_____/


MEMORANDUM OPINION

      The Court conducted a bench trial on July 9, 10, 11, 12 and 17, 2012.  The

bench trial included resolution of the pending counts of the Second Amended

Complaint (Dkt. 56), as shown in the Amended Joint Pretrial Statement (Dkt. 126) and

Pretrial Order (Dkt. 127).  The Second Amended Complaint incorporates the Exhibits

attached to the Amended Complaint (Dkt. 14) and the Complaint (Dkt. 1).   The basis of

jurisdiction is diversity.


      The Second Amended Complaint includes the following:


| | | |
|---|---|---|
| Count I | Suit on Note | Larry Hyman, Assignee, G3 Tampa,, LLC |
| Count II | Suit on Guaranties (Gross Negligence) | Kearney, Harris |
| Count III | Suit on Guaranties | Kearney, Harris |
| Count IV | Foreclosure | (Dismissed) |
| Count V | Declaratory Relief | Kearney, Harris, Seeger |

Case No. 8:09-CV-1841-T-17MAP

The Court notes that Defendant Gregory Bennett was dismissed without prejudice. (Dkt. 100). Count IV of the Second Amended Complaint was dismissed with prejudice. (Dkt. 101). Prior to trial, the Court granted Plaintiff's Motion for Default Judgment on Count I as to Larry Hyman, Assignee of G3 Tampa, LLC, such that after the Court determines the value of the collateral on the date of the Transfer, the Court will enter a final default judgment that fixes the amount owed by the Borrower, G3 Tampa, LLC, on the Obligation, after credit is applied for the value of the Transfer. (Dkt. 98).

G3 Tampa, LLC purchased the Aircraft in 2005, financing the purchase with a loan from Plaintiff Regions Bank. G3 Tampa, LLC granted Regions Bank a security interest in the Aircraft to secure the Obligation. After G3 Tampa, LLC stopped making payments on the loan, Plaintiff Regions Bank send a notice and demand letter on August 25, 2009, accelerating the loan. On September 9, 2009, Plaintiff Regions Bank filed the Complaint, seeking a final judgment against the Borrower and the Obligors.

As to Count I, Plaintiff Regions Bank contends the total amount of the Obligation is $6,229,598.72, plus accrued interest through the date of judgment. Plaintiff Regions Bank concedes that Defendants are due a set-off in the amount of $2,500,000, or such other amount as is determined to be the value of the Aircraft at the time of the Transfer, together with attorney's fees and costs.

As to Count II, Plaintiff Regions Bank seeks a joint and several judgment against Obligors Kearney and Harris, for the full amount of the Count I Judgment, determining that the Guaranty Limitations are not enforceable, plus interest, and attorney's fees and costs recoverable as provided in the Loan Documents.

As to Count III, Plaintiff Regions Bank seeks a final judgment limited to $638,968.75 as to Defendants Tracy Harris, Jr. a Brian Seeger, and to $3,407, 620.35

Case No. 8:09-CV-1841-T-17MAP

as to Defendant Bing Charles W. Kearney, Jr., giving effect to the Guaranty Limitations, plus interest, and attorney's fees and costs recoverable as provided in the Loan Documents.  Count III is an alternative Count to Count II.

As to Count V, Plaintiff seeks declaratory relief as to the Obligor Letters of November 25, 2009 and December 8, 2009.

After consideration of the testimony, exhibits, pre-trial stipulation, and argument of counsel, the Court makes the following findings of fact and conclusions of law.  To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such.  To the extent that any of the conclusions of law might constitute findings of fact, they are adopted as such.

I. Preliminary Issues

A. Admissibility of Exhibits

The Court notes that the parties entered into a stipulation as to the trial exhibits, identifying "Irrelevant Exhibits" and "Disputed Exhibits. (Dkt. 151).  The Parties stipulated that the following exhibits would not be admitted as irrelevant: Defendants' Exhibits Nos. 2, 3, 9, 10, 27, 28, 31, 32, 89, 102, 122, 131.    The Parties stipulated that the relevancy of the following Exhibits is disputed:  Plaintiff's Exhibit Nos. 35, 36, 37, 40, 41, 42, 44, 45, 51, 132, 133; Defendants' Exhibit Nos. 6, 7, 29, 30, 33, 34, 74, 84, 88, 97, 98, 99, 128.

The Court notes that the Parties have filed their agreed transcript of the Recording that was played during the trial and admitted into evidence (Def. Ex. 123(a). (Defendants' Exhibit 123(b)).

3

Case No. 8:09-CV-1841-T-17MAP

As to Exhibits 132 and 133, deposition transcripts of Tracy Harris, Jr. and Bing Charles W. Kearney, Jr., the Court notes that the witnesses both testified individually and in their capacity as corporate representative.   The Bank designated testimony from the depositions in the Amended Joint Pretrial Statement without objection by Defendants.

Plaintiff's Exhibits:

| | |
|---|---|
| 35 | Overruled. |
| 36 | Overruled. |
| 37 | Overruled. |
| 40 | Overruled. |
| 41 | Overruled. |
| 42 | Overruled. |
| 44 | Overruled. |
| 45 | Overruled. |
| 51 | Overruled. |
| 132 | Overruled. |
| 133 | Overruled. |

Defendants' Exhibits:

| | |
|---|---|
| 6 | Sustained. |
| 7 | Sustained. |
| 29 | Sustained. |
| 30 | Sustained. |
| 33 | Sustained. |
| 34 | Sustained. |
| 74 | Sustained. |
| 84 | Sustained. |
| 88 | Sustained. |
| 97 | Sustained. |
| 98 | Sustained. |
| 99 | Sustained. |
| 128 | Sustained. |

Case No. 8:09-CV-1841-T-17MAP

B. Motions to Strike

The Court has entered orders on the pending Motions to Strike separately. (Dkts. 156, 157, 174).

C. Judicial Notice

A related case was filed in Hillsborough County Circuit Court, Case No. 09-CA-028980, G3 Tampa, LLC, Assignment for benefit of creditors.  Plaintiff Regions Bank requested the Court to take judicial notice of the Assignment Papers for all purposes. No objection to the Request for Judicial Notice was filed.  The Court has taken judicial notice of the Assignment Papers.

II. Stipulated Facts

The Court includes the Stipulated Facts shown in the Amended Joint Pre-Trial Statement, for ease of reference.  (Dkt. 126).

1. The Parties agree that Defendants are Obligors for the Obligation under the Loan Documents.  At the time of execution of the Loan Documents in 2005, Regions appraised the Plane for $6,619,698.00.

2. The Parties stipulate that the Plane was properly maintained and insured through December, 2007.

3. The Parties agree that the Assignment of the Aircraft was filed after the Bank initiated this litigation.

4. The Parties agree that the Assignee sought to abandon the Aircraft and the

Case No. 8:09-CV-1841-T-17MAP

Bank filed objections to the same in the Abandonment Action.

5.  The Parties agree that the Assignee abandoned the Aircraft on the Transfer Date to the Bank based upon entry of an agreed order that preserved the Bank's claims in this litigation.

III.  Findings of Fact

In this section, Plaintiff's Exhibits are referred to as "Ex. ___"; Defendants' Exhibits are referred to as "D. Ex. ___", and trial testimony is referenced by (date, p. ___).

1.  G3 Tampa, LLC is a Florida limited liability company that was formed on July 14, 2005.  Bing Charles W. Kearney, Jr. and Tracy J. Harris, Jr. were named managers/managing members in the Articles of Incorporation.

2.  The Operating Agreement for G3 Tampa, LLC was executed on July 14, 2005 by G3 Tampa, LLC's members: Gregory Bennett, Todd Taylor, Bing Charles W. Kearney, Jr., Brian Seeger and Tracy J. Harris, Jr. (Guarantors)  G3 Tampa, LLC was created to acquire, own and operate for the use and benefit of the Members a Gulfstream American Corp. G-1159A executive jet, U.S. Registration No. N704JA, serial no. 432, and to conduct such other business as the Members deem advisable.

3.  In July, 2005, the Guarantors had multiple businesses and investment properties, and substantial net worth.  Bing Charles W. Kearney, Jr. was one of the founders of Platinum Bank and was a member of its loan committee.  In its underwriting of the Obligation, the Bank relied upon the strength of the Guarantors' liquidity as a basis for repayment of the Obligation.  Ex. 2.

Case No. 8:09-CV-1841-T-17MAP

4.  G3 Tampa, LLC is a "Manager-managed" limited liability company.  In the Operating Agreement dated 7/14/2005, Bing Charles W. Kearney, Jr. and Tracy J. Harris, Jr. are appointed Managers of the Company.  The Operating Agreement states:

> 3.  Management.  All business of the Company shall be conducted by a "Manager" who shall have the power to execute agreements and to undertake indebtedness on behalf of the Company.  Bing Charles W. Kearney, Jr. and Tracy J. Harris, Jr. are hereby appointed and designated as Managers of the Company.

Ex. 1.

5.  The Credit Offering Memorandum dated 7/25/2005 pertaining to the loan to G3 Tampa, LLC from Regions Bank states, inter alia: "The individuals are all in the real estate business, they are partners in different projects over the years, all are very successful as evidenced by their personal statements.  The individuals are purchasing this aircraft for both personal use as well as leasing when the aircraft is not being used."

6.  The Guarantors were joint and several unlimited guarantors of the Obligation. The Guarantors were each sophisticated businessmen and were very familiar with the contractual obligations and responsibilities associated with the borrowing of money.

7.  In connection with its approval of the initial Obligation, the Bank obtained an appraisal of the Aircraft reflecting a value of $6,619.698.  Ex. 2.  The Bank approved funding of the full amount necessary to purchase the Aircraft.

8.  The Obligation was secured by the Aircraft described as Gulfstream American Corp. G-1159A Executive Jet Aircraft, FAA registration Number N704JA, serial number 432 including parts and accessories and Aircraft related books and records ("the Aircraft"), as well as the books and records of the Borrower.  Ex. 5.

Case No. 8:09-CV-1841-T-17MAP

9. The Loan Documents were executed on 8/1/2005, and were modified on 5/15/2007. The Loan Documents include the Credit Agreement, Promissory Note ($5,715,000), Aircraft Chattel Mortgage, Security Agreement and Assignment of Leases and Rents, and the Guaranties of Bing Charles W. Kearney, Jr., Brian Seeger, Tracy J. Harris, Jr. and Gregory Bennett. The Modified Loan Documents include the Renewal Promissory Note ($5,111,750), First Amendment to Credit Agreement, Consent and Reaffirmation of Guarantor and Amendment of Guaranty Agreement (Kearney), Consent and Reaffirmation of Guarantor and Amendment of Guaranty Agreement (Seeger), Consent and Reaffirmation of Guarantor and Amendment of Guaranty Agreement (Bennett), Consent and Reaffirmation of Guarantor and Amendment of Guaranty Agreement (Harris), Consent and Reaffirmation of Guarantor and Amendment of Guaranty Agreement (Kearney), ISDA Swap Agreement, with Attached Schedule. Ex. 2-13, 16-21, 25.

10.   The Credit Agreement includes the following provisions:

 Article I of the Credit Agreement includes definitions and accounting terms, as follows:

....

**"Default"** means any of the events specified in **Section 8.01,** whether or not any requirement for the giving of notice, the lapse of time, or both, or any other conditions, has been satisfied.

....

**"Events of Default"** means any of the events specified in **Section 8.01,** provided that any requirement for the giving of notice, the lapse of time, or both, have been satisfied.

....

**Section 1.02. Accounting Terms and Uniform**

Case No. 8:09-CV-1841-T-17MAP

**Commercial Code.** All accounting terms not specifically defined herein shall be construed in accordance with GAAP and all financial data submitted pursuant to this Agreement shall be prepared in accordance with such principles. When used herein, the term "financial statements" shall include the notes and schedules thereto. Terms relating to the Collateral, if not expressly defined herein, shall have the meanings ascribed thereto in the Uniform Commercial Code as enacted in the State of Florida including, without limitation, Florida Statutes 679 relating to secured transactions, as amended from time to time.

**Section 1.03. Construction.** Unless the context of this Agreement clearly requires otherwise, references to the plural shall include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or". The words "hereof", "herein", "hereby", "hereunder, and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Section, subsection, clause, schedule and exhibit references are to this Agreement unless otherwise specified. Any references in this Agreement or in the Loan Documents to this Agreement or any of the Loan Documents shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions and supplements thereto and thereof, as applicable. All of the schedules and exhibits to this Agreement shall be deemed incorporated by reference. Each references (sic) to "Borrower" or "Borrowers" shall be deemed to relate to each Borrower individually and to all Borrowers collectively it being the intent of the parties that the obligations, representations, warranties and pledges of each Borrower hereunder shall be joint and several.

Article II of the Credit Agreement includes the Loan terms, as follows:

**SECTION 2.01. (a) The Loan.** The Bank agrees, on the terms hereinafter set forth, to make a loan to Borrower on the date of this Agreement in the principal amount of **FIVE MILLION SEVEN HUNDRED FIFTEEN THOUSAND**

Case No. 8:09-CV-1841-T-17MAP

**DOLLARS ($5,715,000.00).**  There is no revolving feature to the Loan.

....

**(h)  Collateral Security for the Loan.**  The Loan shall be secured by Borrowers granting to the Bank a duly perfected first lien security interest in all of the Collateral.

....

**SECTION 2.10.  Additional Remedies of Bank.**  In addition to other remedies available to the Bank in an Event of Default under this Agreement, should Borrower default, violate, breach or fail to comply with and perform any one or more of the express covenants, conditions and provisions of this Agreement, which default, violation, breach or failure remains uncured ten (10) days after written notice thereof to the Borrower, or default under any of the Notes, then the Bank shall have the absolute right, at its option and election, to (1) cancel this Agreement by written notice to the Borrower; (2) institute appropriate proceedings to specifically enforce performance hereof; (3) withhold further Advances hereunder; (4) take immediate possession of the Collateral, (5) appoint a receiver, as a matter of strict right without regard to the solvency of Borrower, for the purpose of preserving the Collateral, preventing waste, and to protect all rights accruing to Bank by virtue of this Agreement.  All expenses incurred in connection with the appointment of said receiver, or in protecting, preserving, or improving the Collateral shall be chargeable against the Borrower and shall be enforced as a lien against the Collateral.  Nothing herein shall be construed to require notice or opportunity to cure in the event that Borrower defaults in any obligation to pay money under the Note.  The said remedies and rights of Bank shall be cumulative and not exclusive, the Bank to be privileged and have the absolute right to resort to any one or more, or all of the said remedies, neither to the limited exclusion of the other, or any other remedy available to the Bank at law or equity, in the event of any such default or breach of said agreement or provisions by the Borrower. The Bank shall have the absolute right to apply any balance

10

Case No. 8:09-CV-1841-T-17MAP

> of the Loan funds as a payment toward the Note, and no
> other party shall have any interest in any Loan funds so
> applied and shall not have any right to garnish, require or
> compel payment thereof toward discharge or satisfaction of
> any claim or lien which they or any of them have or may
> have.
>
> ....

Article IV of the Credit Agreement states Borrower's representations and
warranties to the Bank, including **SECTION 4.13, (a) through (e),
Warranties and Representations Relating to Aircraft.**

Article V of the Credit Agreement states Borrower's Affirmative
Covenants, as follows:

> So long as the Note shall remain unpaid or the Bank shall
> have any Commitment under this Agreement, each entity
> constituting the Borrowers shall:
>
> .....
>
> **SECTION 5.03.  Maintenance of Properties.**
>
> (a)    Maintain, keep and preserve, all of its
>        properties (tangible and intangible) necessary
>        or useful in the proper conduct of its business,
>        in the aggregate, in reasonable working order
>        and condition, ordinary wear and tear
>        excepted;
>
> (b)    Borrower shall, at their sole expense, maintain and
>        keep the Aircraft in good order and repair, ordinary
>        wear and tear excepted.  Without limiting the
>        generality of the foregoing, Borrowers shall:
>
>        (i) Keep the Aircraft in accordance with and in
>        compliance with the requirements of
>        Borrower's FAA approved maintenance
>        program, all of the manufacturers' manuals
>        and mandatory service bulletins, and all of the
>        manufacturers' non-mandatory service
>        bulletins relating to airworthiness;

11

Case No. 8:09-CV-1841-T-17MAP

> (ii) replace in or on the Aircraft, any and all engines, parts, appliances, instruments or accessories which may be worn out, lost, destroyed or otherwise rendered unfit for use;
>
> (iii) perform all overhauls, checks, inspections, and maintenance service to all parts of the Aircraft as are required to be performed under all applicable mandatory Airworthiness directives (AD notes), Federal Aviation Regulations (FARs), Special Federal Aviation Regulations (SFARs), and manufacturers' mandatory service bulletins affecting airworthiness, the compliance date of which shall fall due during the term of this Agreement.

> (c)   Borrower, at its own cost and expense, will promptly replace all engines, accessory equipment or parts, which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever....

**SECTION 5.05, (a) through (i)**, of the Credit Agreement states the duties of Borrower as to **Maintenance of Insurance**

**SECTION 5.08** of the Credit Agreement states the Borrower's Reporting Requirements, including Borrower's duty to furnish to Regions Bank.  **SECTION 5.08(6)** provides:

> **(6)   Notice of Defaults and Events of Default.**
> Immediately after the occurrence of each Default or Event of Default, a written notice setting forth the details of such Default or Event of Default and the action which is proposed to be taken by the Borrower with respect thereto;....

12

Case No. 8:09-CV-1841-T-17MAP

> **SECTION 5.10** and **SECTION 5.11** of the Credit Agreement
> provide:
>
> **SECTION 5.10. Logs and Certificates.**   Borrower shall
> keep and maintain on the Aircraft at all times, the Aircraft's
> Certificate of Airworthiness and Certificate of Aircraft
> Registration together with all other documents and records
> required by law to be maintained on the Aircraft.  All items
> contemplated by this **Section 5.10** as well as all owner's and
> operating manuals, user's guides, pilot's guides, flight
> manuals, flight logs and records, airframe and engine
> inspection logs and records, all service bulletin compliance
> logs and records, and all airworthiness directive compliance
> logs and records, shall be produced for inspection by the
> Bank or its designated representative upon request by the
> Bank.
>
> **SECTION 5.11. Storage of the Aircraft.**  The aircraft shall
> be parked and stored in an appropriate hangar at all times
> that it is not engaged in or preparing for flight or in-transit
> between its principal location and a flight destination.
> Notwithstanding in-transit status, the Borrower shall not
> permit the Aircraft to be parked or stored on tarmac, open to
> the elements, for any period in excess of ten (10) days.

Article VI of the Credit Agreement states the Negative Covenants, as
follows:

> So long as the Note shall remain unpaid none of the entities
> constituting the Borrower will, without the prior written
> consent of the Bank:
>
> ....
>
> **SECTION 6.08. Restrictions as to Use of Aircraft.**
>
> ....
>
> (b)      Borrower shall not use or permit the Aircraft to be
>            used in any manner or for any purpose excepted from
>            or contrary to any insurance policy or policies required
>            to be carried and maintained pursuant to the

13

Case No. 8:09-CV-1841-T-17MAP

provisions of this Agreement or for any purpose or for the carriage of any goods of any description excepted or exempted from or contrary to said insurance policies, or to do any other act or permit anything to be done which could reasonably be expected to invalidate or limit any other insurance policy or policies of which could in any way reasonably be expected to invalidate or limit any other insurance policy or policies of which could in any way render or cause the title of the Borrower or the lien right of the Bank to be in any way jeopardized or unperfected or in any way invalid as against the Borrower or any third parties.

    ....

(e)    Borrower shall not lease or charter the Aircraft, nor transfer operation and control of the Aircraft to an operator, nor enter into a service contract whereby the Borrower operates the aircraft on behalf of a third party, in any event without the written consent of the Bank.

Article VIII of the Credit Agreement provides: .

**SECTION  8.01. Events of Default.**  The occurrence of any of the following events shall constitute an Event of Default:

(1)    The Borrower should fail to pay the principal of, or interest on the Note, or any amount fee, as and when due and payable or Borrower or any Guarantor shall fail to pay any debt owed to the Bank as and when due and payable;

    ....

(3)    Borrower shall fail to perform or observe any term, covenant, or agreement not requiring the payment of money contained in any Loan Document (other than the Note) to which it is a party on its part to be performed or observed which failure continues for a period of fifteen (15) days following receipt by Borrower of written notice from the Bank.

14

Case No. 8:09-CV-1841-T-17MAP

Article IX of the Credit Agreement states:

> **SECTION 9.01.  Amendments, Etc.**  No amendment, modification, termination or waiver of any provision of any Loan Document to which the Borrower is a party, nor consent to any departure by the Borrower from any Loan document to which it is a party shall in any event be effective unless the same shall be in writing and signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.
>
> ....
>
> **SECTION  9.03.  No Waiver; Remedies.**  No failure on the part of the Bank to exercise and no delay in exercising any right, power, or remedy under any Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any rights under any Loan Documents preclude any other or further exercise thereof or the exercise of any other right.  The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law.
>
> ....
>
> **SECTION 9.06.   Governing Law and Venue**.  This Agreement and the Note shall be governed by, and construed in accordance with, the laws of the State of Florida.  Hillsborough County, Florida shall be the exclusive venue for any litigation involving this Agreement.  The prevailing party shall be entitled to recover its reasonable attorneys' fees and costs in any litigation involving this Agreement, including, without limitation, fees and costs on appeal.
>
> ....
>
> **SECTION  9.11**.  **Attorney's Fees.**    The Borrower shall pay the Bank's reasonable attorneys' fees in connection with

15

Case No. 8:09-CV-1841-T-17MAP

the enforcement of any of the Loan Documents after Default by Borrower.  The prevailing party in any litigation arising under or in any way related to any of the Loan Documents shall be entitled to recover its reasonable attorney's fees and paralegals' fees including, without limitation, fees on appeal.

**SECTION 9.12.  Complete Agreement.**  This is (sic) Agreement and the related Loan Documents embody the entire agreement between the parties.  Any and all representations, warranties or agreements of the parties, whether written or oral, are superseded by this Agreement. No course of dealing may be asserted by either party to negate, waive or modify any provision of this Agreement. This Agreement cannot be amended or modified except by written instrument signed by both parties.

11.  The members of G3 Tampa, LLC shared the expenses for ownership and operation of the Aircraft, including hangar lease fees, insurance, maintenance, fuel, pilot and flight crew fees, and sales tax according to a formula developed by Brian Seeger ("Seeger Formula").   (7/17/2012, p. 131-133, 140).

12.   The revenues received from members and third parties for use of the Aircraft were not sufficient to cover all of the operating expenses of the Borrower, such that the Borrower was insolvent at all times after inception through November 19, 2009. Ex. 64, (7/17/2012, pp. 55-58, p. 155).

13.  In July, 2007, G3 Tampa, LLC approached the Bank to modify the terms of the original Loan Documents to extend the maturity date, provide for a period of interest-only payments, reduce the interest rate, and fix the interest rate pursuant to a swap agreement. Ex. 9, 10, 11.  The Swap Agreement executed in conjunction with the 2007 Modification was the instrument by which G3 Tampa, LLC converted their variable interest rate to a fixed rate.

16

Case No. 8:09-CV-1841-T-17MAP

14.  In connection with its underwriting and approval of the 2007 Modification, the Bank performed an evaluation of the Aircraft and determined that it had an approximate value of $6,039,003 as of March 6, 2007.  Ex. 11, (7/11/2012, p. 183-184, 186-187).

15.  In connection with the Swap Agreement component of the 2007 Modification, the Bank made a recording (the "Recording") of its conversation with Bing Charles W. Kearney, Jr., in his capacity as a managing member of G3 Tampa, LLC and others. Ex. 123a, 123b, (7/9/2012, p. 168-169; 7/10/2012, p. 11-17).  The Recording reflects a minute or so of conversation between the Borrower and the Bank which occurred prior to the Bank's announcement that it would be recording the call. (7/10/2012, p. 18-20, 24-25).

16.  The Borrower did not voice an objection to the Bank's recording during the Recording.  Ex. 123a, 123b.  The Swap Agreement provides for consent to recording.

17.  The Bank produced the Recording to Defendants in response to a discovery request but otherwise never published or transmitted the Recording to any third party. Ex. 123a, 123b.

18.  Defendant Bing Charles W. Kearney, Jr. admitted no evidence nor identified in his testimony any damage that could be linked to the Recording.  (712/2012, p. 134).

19.  Each of the Guarantors and Todd Taylor executed a "Consent and Reaffirmation of Guarantor and Amendment to Guarantor Agreement" dated effective May 15, 2007, each of which limited the guaranties of the Guarantors in proportion to their then ownership interests in G3 Tampa, LLC.  Ex. 18-21, (7/9/2012, p. 71-73).

20.  After the Modification, Todd Taylor assigned his rights and interests in G3

Case No. 8:09-CV-1841-T-17MAP

Tampa, LLC to Bing Charles W. Kearney, Jr. Ex. 27, (7/17/2012, p. 44).

21.  In consideration for a release of Todd Taylor's Limited Guaranty, the Bank approved a further modification of the Loan Documents to permit Bing Charles W. Kearney, Jr. to execute a second and final guaranty ("Substitute Kearney Guaranty") that increased the limitation of his Limited Guaranty in proportion to his increased ownership stake in G3 Tampa, LLC. Ex. 26, (7/9/2012, p. 73-74). The Bank released Todd Taylor from his guaranty. Ex. 26, (7/9/2012, p. 73-74).

22.  The Bank did not take action to reflect on the Limited Guaranty of Bing Charles W. Kearney, Jr. was superseded and replaced by the Substitute Kearney Guaranty. (7/9/2012, p. 119). Bing Charles W. Kearney, Jr. did not present testimony or evidence that contravened the facts as to the Substitute Kearney Guaranty at trial.

23.  After the purchase of the Aircraft and through 2008, G3 Tampa, LLC utilized Southern Air Systems, Inc. ("Southern Air") to perform the inspections and maintenance required by Maintenance Obligation. Ex 87, p. 28-30.

24.  As part of the service provided to G3 Tampa, LLC, Southern Air procured insurance on the Aircraft in fulfillment of the Insurance Obligation for all relevant years through the termination of its services. D. Ex. 7, Ex. 87, p. 36.

25.  On June 11, 2008, G3 Tampa, LLC entered into an Aircraft Sales Management Agreement with ATC Jets, LLC ("ATC"), appointing ATC as the sole marketing agent to sell the Aircraft, with an asking price of $7,350,000.00. Ex. 28, (7/11/2012, p. 88-90). At that time, ATC was in agreement with the 2008 asking price as being within the range of similar aircraft on the market, even though a substantial percentage of available aircraft of the same model as the Aircraft were on the market and the average number of days on the market was more than a year. Ex. 28,

18

Case No. 8:09-CV-1841-T-17MAP

(7/11/2012, p. 90-94).  The 2008 asking price presumed that the Aircraft was airworthy and current with its Maintenance Obligation.  (7/11/2012, p. 94-95).

26.  On November 17, 2008, G3 Tampa, LLC decided to terminate the listing agreement with ATC, and to move the Aircraft from Tampa International Jet Center to St. Petersburg.  Ex 29.

27.  G3 Tampa, LLC notified Tampa International Jet Center of G3 Tampa LLC's intent to vacate on November 28, 2008, and cancelled the management agreement with Southern Air Systems on December 1, 2008.  Ex. 30, 31.

28.  As a result of the cancellation of the agreement with Southern Air, G3 Tampa, LLC was required to obtain its own insurance.  G3 Tampa, LLC procured a new insurance policy to cover the Aircraft as of December 31, 2008.  Ex. 32.  The insurance policy contained an "Industrial Aid Amendment" ("Industrial Aid Exclusion') that precluded G3 Tampa, LLC from charging others for the use of the Aircraft for any expense other than "direct aircraft expenses like gas and oil" (collectively, the "Direct Expense").  G3 Tampa, LLC paid $9,535 of the $24,039 premium (the "Insurance Premium").  Ex. 87, p. 6, 36.  G3 Tampa, LLC almost immediately suspended coverage under the Insurance Policy, for which it received a refund of $1,997 of the Insurance Premium.

29.  In January, 2009, the Bank conducted an internal desktop evaluation of the Aircraft and estimated a value of $4,800,000 for the Aircraft (the "January 2009 Value").  Ex. 48, 55, (7/11/2012, p. 187-189).  The January 2009 Value assumed that the Aircraft was airworthy, up to date with all inspection and maintenance requirements, and undamaged in the absence of any information to the contrary.

30.  Mike Hamill proposed a "dry lease" arrangement with G3 Tampa, LLC in

Case No. 8:09-CV-1841-T-17MAP

January, 2009. A "dry lease" is an arrangement whereby the lease of an aircraft is without crew.   In January and February, 2009, Mike Hamill met with Bing Charles W. Kearney, Jr. and Rosie Appelbe to discuss options to lease the Aircraft. Ex. 33, 25, 36, 51, (7/12/2012, p. 39-40, p. 78-80).  The Exhibits reflect G3 Tampa, LLC's knowledge that at that time the Aircraft required that some Maintenance be performed.

31.  At trial, Bing Charles W. Kearney, Jr. testified that he did not recall talking with Mike Hamill about the "Unconsented Lease"; however, the Exhibits establish that the meetings occurred and that the parameters and terms for Unconsented Leases were discussed and notated. Ex. 33, 35, 36, 51.

32   Mike Hamill executed the proposed agreement with G3 Tampa, LLC on behalf of  Pro Pilot Services, LLC on February 1, 2009.  D. Ex. 37.

33.  On February 12, 2009, G3 Tampa, LLC entered into an Office Hangar Lease Agreement with Sheltair St. Petersburg, LLC.  Ex. 38.

34.  G3 Tampa, LLC made payments to Pro Pilot Services  for February and March, 2009.

35.  On February 17, 2009, G3 Tampa, LLC authorized Michael J. Hamill, Benjamin S. Vesey, and Greg R. Woodbridge to use the G3 Tampa, LLC credit card to purchase material and goods for the sole and exclusive use and operation of the Aircraft.  Ex. 39.

36.  On February 17, 2009, G3 Tampa, LLC retained counsel in connection with a "dry lease" of the Aircraft.  Exh. 40, 41, 42.

37.  On February 23, 2009, the Aircraft was flown from St. Petersburg, FL to

20