UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


REGIONS BANK,

        Plaintiff,

        v.                       CASE NO. 8:09-cv-1841-T-17MAP

LARRY S. HYMAN, BING CHARLES
W. KEARNEY, JR., BRIAN SEEGER,
TRACY J. HARRIS, JR., and GREGORY
BENNETT,

        Defendants.
_____/

## <u>REPORT AND RECOMMENDATION</u>

Regions Bank ("Regions"), the judgment-creditor in this action, moves for an order

garnishing certain bank accounts belonging to judgment-debtor Bing Charles W. Kearney,

Jr. ("Kearney").[1]  Kearney, in turn, urges the Court to dissolve the writs on grounds that

Regions failed to abide by the notice provisions of Florida's garnishment scheme and that

the funds in one of his accounts (the 056 account at USAmeriBank) is statutorily protected

(tenancy in the entireties).  After evidentiary hearings on the matter and consideration of the

parties' arguments, I recommend Kearney's motion to dissolve the USAmeriBank and

Platinum Bank writs of garnishment be granted for the reasons Kearney mainly asserts.[2]

---

[1]  Two writs of garnishment are at issue: one to USAmeriBank (doc. 199) and the
other to Platinum Bank is at doc. 241.

[2]  Kearney's motion to dissolve is at doc. 255, and his claim of exemption is at doc.
218.  The district judge referred these matters to me for a report and recommendation (doc.

*A. Background*

Fed. R. Civ. P. 69 dictates that the procedure on execution of a judgment "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Florida's Chapter 77 sets out the process for the issuance and enforcement of writs of garnishment. Because some of its provisions are intricate, a prefatory review of its applicable parts offers context for pinpointing the relevant events and for underscoring the responsibilities the scheme sets out for the judgment creditor, the judgment debtor, and the garnishee.

Once a judgment is rendered in its favor, an entity has a right to seek a writ of garnishment. Fla. Stat. § 77.01. The judgment creditor (identified as the "plaintiff" in the Chapter 77) is required to send the judgment debtor (identified as the "defendant" in Chapter 77) two separate notices. *See* Fla. Stat. §§ 77.041 and 77.055. And the statutory demands for these notices are particularly explicit, both in their content and in their timeliness. Kearney takes issue with Regions's performance as to both notices.

The first notice, which is covered by Fla. Stat § 77.041 and triggered with the issuance of the writ of garnishment, required Regions to have mailed specific items to Kearney (the statute says "plaintiff *must* mail"). The list includes: a copy of the writ of garnishment, a copy of the motion for writ of garnishment, and an advisory notice whose

---

285). *See* 28 U.S.C. § 636 and Local Rule 6.01. Accordingly, the parties filed for my consideration numerous affidavits and memorandums addressing these issues. *See* docs. 255, 266-272, 273, 300, 358, 373, 375.

exact language the statute dictates telling the judgment debtor of his right to timely file a claim of exemption from the judgment (for example, that he owned the property as tenants by the entireties). The statute also required Regions to have mailed these items to Kearney's last know address within a certain time frame: five business days after the writ is issued or three business days after the writ is served on the garnishee, whichever was later. Fla. Stat. § 77.041(2). As the facts will show, and as Regions candidly admits, Regions missed this deadline.

The second notice the judgment creditor must send occurs after the garnishee's answer, which is the intervening event between the first and second notices. At first blush this second notice may seem redundant to the first. But on closer inspection this second notice is more expansive than the first in that the later notice may, depending on the garnishee's answer, require the judgment creditor to notice someone in addition to the judgment debtor that is affected by the garnishment effort. Accordingly, Fla. Stat. § 77.055 required Regions to have served Kearney and "any *other* person disclosed in the garnishee's answer to have any ownership interest in the deposit, account, or property controlled by the garnishee" with a copy of the garnishee's answer, and a notice advising that they had 20 days from the date indicated on the certificate of service in the notice to move to dissolve the writ of garnishment. Fla. Stat. § 77.055 (emphasis added). As the facts will show, Regions failed to meet these requirements for the USAmeriBank writ and the Platinum writ.

Kearney's complaints about Regions's failure to adhere to the notice demands of Chapter 77 are not his only grievances. He also contends that his 056 account at

USAmeriBank is exempt from garnishment because he owns these funds with his wife as tenants in the entireties. I held evidentiary hearings on June 11, 2013, and August 20, 2013, on all these issues.[3] The upshot of those hearings is that Regions failed to adhere to the notice provisions of Florida's garnishment scheme; that Kearney clearly indicated to USAmeriBank personnel that he wanted the 056 account he owned with his wife to be one that reflected that legal distinction; the signature card he and his wife signed for the 056 account is confusing and unclear as to the type of ownership they selected; and that, with rare exception, USAmeriBank's line officers opened husband and wife accounts as joint accounts with a right of survivorship as opposed to accounts held as tenants in the entireties, thereby reflecting an institutional misunderstanding of the special status afforded tenancy-in-the-entirety accounts, which is the statutorily presumed option.

### C. Discussion

Florida courts consistently adhere to a time-honored, stringent standard when applying the garnishment scheme – its provisions are strictly followed and strictly construed. This overarching view holds true for the judgment creditor and the judgment debtor. *Robinson v. Robinson*, 154 Fla. 464, 18 So. 2d 29 (1944); *Pleasant Valley Farms & Morey Condensory Co. v. Carl,* 90 Fla. 420, 106 So. 427 (1925); *Akerman Senterfitt & Edison, P.A. v. Value Seafood,* __ So. 3d ___, 2013 WL 4734574 (Fla. 3d DCA 2013) ("It is fundamental that garnishment must be strictly construed." (citations omitted)); *Zivitz v. Zivitz*, 16 So. 3d

---

[3] Fla. Stat. § 77.07(1) requires a court confronted with motion to dissolve a writ to "set down such motion for an immediate hearing."

841, 847 (Fla. 2d DCA 2009) ("Garnishment proceedings are statutory in nature and require strict adherence to the provisions of the statute."); *Gigliotti Contracting North, Inc. v. Traffic Control Products of North Florida, Inc.,* 788 So.2d 1013, 1016 (Fla. 2d DCA 2001); *Navon, Keopelan & O'Donnell, P.A. v. Synnex Information Technologies, Inc.,* 720 So .2d 1167 (Fla. 4th DCA 1998); *T-Jett Enterprises, Inc. v. Ernest and Stewart, Inc.,* 543 So. 2d 390 (Fla. 3d DCA 1989) (finding appellee's failure to comply with notice requirements of §77.055 sufficient to reverse garnishment order).   The reason these cases give for this stringent standard of review is that garnishment is a creature of statute.   *Id.*

### 1. the USAmeriBank writ

#### a. notice failures

Regions served USAmeriBank with the writ of garnishment on May 17, 2013; on May 24, 2013, USAmeriBank served its answer.  Section 77.041(2), which governs the first of the two notices, required Regions to have mailed Kearney the prescribed notice with all its statutory requirements by May 23, 2013.  Regions's certificate of service shows that it mailed the notice to Kearney on May 28, 2013, five days late.  That oversight, says Regions, is harmless; Kearney timely filed his claim of exemption, which is the purpose of the  notice requirement.   Florida courts, however, have not stretched the scheme's deadlines.   For example, in *Zivitz, supra*, the court strictly adhered to the deadlines in the same section at issue here, § 77.041 (albeit for the first subparagraph and not for our second).  The debtor's late filing of his exemption claim doomed his effort – the section "clearly proves a garnishment defendant *must* complete and file a claim of exemption and request a hearing

5

with twenty days or else he *may* lose important rights to his property." *Id.* at 16 So. 3d at 847 (emphasis in original). Applying the literal language of the statute (reading the statute otherwise would render the language "meaningless"), the court concluded that "must" meant "must." *Id.*

Kearney argues *Zivitz's* strict approach applies here. I agree. This result may seem unfair – too harsh for Regions and too fortuitous for Kearney. But this section's strict application was equally unfair for the judgment debtor in *Zivitz* who missed his deadline and equally fortuitous for his judgment debtor who benefitted from his oversight.[4] In the end, as the *Zivitz* court concluded, the statute's direct and plain use of the term, "must," can have only one meaning. Regions knew this or should have known this when it began its garnishment efforts. Kearney's motion to dissolve on this ground has merit. *See Cullen v. Marsh*, 34 So. 3d 235 (Fla. 3d. DCA 2010); *Rudd v. First Union Nat. Bank of Florida*, 761 So. 2d 1189, 1192 (Fla. 4th DCA 2000).[5]

These failures are not the only reasons warranting dissolution of Regions's writ to USAmeriBank. Not only does the garnishment scheme impose obligations on the judgment creditor and the judgment debtor, it puts obligations on the garnishee too. Section 77.06(2) requires the garnishee to "report in its answer" not only its indebtedness to the defendant (the

---

[4] Regions did not offer a reason for missing the deadline, not that one would matter to a Florida court considering the late notice.

[5] This is not Regions's only notice problem, although it is enough to dissolve the USAmeriBank writ. Regions's late effort to notify Kearney about this writ as required by Fla. Stat. §77.041(2) failed to include all the items the statute demanded.

judgment-debtor) but also the "deposit[s]" and account[s]" in its possession *and* the names and addresses (if known) of others "having or appearing to have an ownership interest in the involved property." USAmeriBank's answer to Regions's writ failed to meet these straightforward requirements. While the answer recited the indebted amount ( $700,022.29), it failed to identify the accounts Kearney holds, or to note their descriptions, or to say whether he holds the funds individually or with others, and if with others, whether as joint tenants or as tenants in the entireties. *See* doc. 212. In truth, Kearney holds several accounts at USAmeriBank with family members:

| | |
|---|---|
| Account 056 (money market account) | Owned by Kearney and wife Tonya Nuhfer Kearney |
| Account 3695 (personal checking account) | Owned by Kearney and wife Tonya Nuhfer Kearney |
| Account 0129 (personal savings account) | Owned by Kearney wife Tonya Nuhfer Kearney |
| Account 302 | Owned by son Clayton W. Kearney and Kearney |
| Account 020 | Owned by son Clayton W. Kearney and Kearney |
| Account 7939 | Owned by brother Bryan G. Kearney and Kearney |

For some of these accounts, like those of his son's and brother's, Kearney claims he serves only as a "convenience signatory." *See* Kearney Aff., doc. 266, ¶¶14-15. For the 056 account, Kearney asserts that he owns its funds with his wife as tenants in the entireties. Irrespective, Regions apparently advocates that its writ reaches all the "Kearney" accounts

even though Regions has not noticed anyone other than Kearney.

USAmeriBank's omissions and missteps in its answer are not without consequences. "The statutory right to move to dissolve the writ is granted only to the defendant and any other person having an ownership interest in the property, as disclosed by the garnishee's answer." *Rudd*, 761 So. 2d at 1191 (citing *Navon, Kopelman & O'Donnell, P.A. v. Synnex Info. Tech., Inc.*, 720 So.2d 1167, 1168 (Fla. 4th DCA 1998); § 77.07(1), Fla. Stat.; *see* Fla. Stat. § 77.07(2). USAmeriBank's deficient answer deprived the "other" owners of these accounts their statutorily required notice. And while one could read Regions's notice obligations under Fla. Stat. § 77.055 to be limited to Kearney because he was the only one USAmeriBank's answer identified, due process requires more specific notice to the affected owners other than word of mouth from Kearney. Regions is not without blame for these deficiencies; it should have known that USAmeriBank's answer failed to meet a garnishee's statutory obligations. And, when it did learn about the other account holders, Regions still failed to notice them.[6]

---

[6] Regions learned of these account co-owners when Kearney sent correspondence to Regions on May 20, 2013, advising that the garnished accounts are owned with his wife as tenants by the entireties and when Kearney filed an affidavit in support of his motion to dissolve the writ on June 3, 2013, reiterating that some of the USAmeriBank accounts were co-owned with his wife and indicating that his other USAmeriBank accounts were co-owned by his son, Clayton and brother, Bryan. *See* docs. 220-1 (Kearney's letter), 266 (Kearney's Aff.). However, even after learning that USAmeriBank failed to include these co-owners names, identities, and addresses in its answer as it was obliged to per §77.06(2), Regions failed to inquire about these account co-owners in it June 7, 2013 reply. *See* USAmeriBank's reply, doc. 233. Section 77.061 provides that "[w]hen any garnishee answers and plaintiff is not satisfied with the answer, he or she shall serve a reply within 20 days thereafter denying the allegations of the answer as he or she desires. …"

In Florida, a married couple is entitled to own property as tenants by the entireties ("TBE") or to hold property as joint tenants with a right of survivorship. *Beal Bank v. Almand & Assoc.*, 780 So. 2d 45, 53 (Fla. 2001).  Although these ownership forms are similar, the legal consequences between the two are significant when creditors of one spouse seek to garnish these assets. *Id.*  Property held as TBE belongs to neither spouse individually; each spouse is seized of the whole. *Id.*[8]  For this reason, only the creditors of both, jointly, can attach such property.  It cannot be reached to satisfy the obligation of one spouse (Kearney's judgment debt for example). *Id.*  In contrast, a joint tenancy with right of survivorship permits a creditor holding debt against one spouse to attach the debtor's share of the property, leaving the share of the non-debtor spouse unaffected. *Id.*

Fla. Stat. §655.79(1) (2008), amended after *Beal*, presumes that "[a]ny deposit or account made in the name of two persons who are husband and wife shall be considered a

---

[7] Given my findings that as to the USAmeriBank writ Regions failed to adhere to the notice requirements set out in Chapter 77, it is unnecessary to address Kearney's exemption claim to the 056 account.  Nonetheless, in view of the district judge's referral, and to completely address the issues raised by the parties in their pleadings, I report and recommend regarding Kearney's claim of exemption.

[8] Tenancy by the entireties property possesses six characteristics: (1) unity of possession (joint ownership and control); (2) unity of interest (the interests in the account must be identical); (3) unity of title (the interests must have originated in the same instrument); (4) unity of time (the interests must have commenced simultaneously); (5) survivorship; and (6) unity of marriage (the parties must be married at the time the property became titled in their joint names). *Beal*, 780 So.2d at 53.  This last characteristic makes the classification unique to married couples. *Id.*

tenancy by the entirety unless otherwise specified in writing." The statute further provides

that "[t]he presumption created in this section may be overcome only by proof of fraud or

undue influence or clear and convincing proof of a contrary intent." §655.79(2). It is this

presumption, and more particularly the proof of a contrary intent, that the parties dispute.

Yet, most of the events surrounding the opening of the account are undisputed.

Sometime in 2010, Kearney and his wife received a large tax refund ($1,135,566)

from the Internal Revenue Service ("IRS") covering the previous tax year (doc. 289, pp. 32-

33; Pl's Ex. 169, IRS tax refund check). At the time, Kearney faced numerous lawsuits, and

his construction company had filed for bankruptcy. On the advice his lawyers, he decided

to deposit the funds in a TBE account (doc. 363, p. 46). Heeding that instruction at the bank

of his choice proved to be a much more complicated chore than he or his lawyers likely

imagined.[9]

---

[9] The fact that the Kearneys deposited their joint refund into their bank account raises
a particular issue which I directed the parties to address (doc. 292), namely: whether the
putative classification of the bank account (joint tenants with a right of survivorship as
Regions claims) trumps the putative classification of the IRS refund check (potentially
tenancy in the entireties property). The answer to this question in the Eleventh Circuit is
unclear. *Compare Gordon v. United States,* 757 F.2d 1157, 1159 (11th Cir. 1985) ("Where
spouses claim a refund under a joint return, the refund is divided between the spouses, with
each receiving a percentage of the refund equivalent to his or her proportion of the withheld
tax payments.) and *In re Ascuntar*, 487 B.R. 319 (Bkrtcy. S.D. Fla. 2013) (applying rationale
in *Gordon* to conclude that a joint refund cannot be claimed as entireties property) *with In
re Sinnreich*, 391 F.3d 1295 (11th Cir. 2004) (only the IRS can defeat the unity of interest
that is presumed to exist under *Beal Bank*) and *In re Newcomb*, 483 B.R. 554 (Bkrtcy. M.D.
Fla. 2012) (applying *Sinnreich's* reasoning to conclude that under Florida law married
couples may own joint tax refunds as tenants by the entirety and *Beal Bank's* presumption
applies to the tax refund) and *Branch Banking and Trust Co. v. Lawrence T. Maxwell*, Case
No. 8:10-cv-2464-T-23AEP (M.D. Fla. 2012) (Report and Recommendation at doc. 105

Kearney took the check to USAmeriBank and instructed the bank to open and deposit the refund into a new TBE account, the 056 account, with Mrs. Kearney and Charles as signatories (doc. 289, p. 33; doc. 363, p. 47).[10] USAmeriBank's personnel then gave him a form to sign (the signature card), which he took home for Mrs. Kearney and Charles to sign (doc. 363, p. 47; Def's Ex. 5, first signature card for the 056 account). After he, Mrs. Kearney, and Charles signed the signature card, he returned the signature card to USAmeriBank and told USAmeriBank's personnel that he had completed the form for his TBE account. Bank personnel, however, informed him that his son could not be on a TBE account (doc. 363, p. 48). As a result, USAmeriBank completed another form keeping the 056 account number and removing Charles from the account (*Id.* at p. 51). In the upper left corner of the second signature card for the 056 account labeled "Ownership of Account," USAmeriBank selected "Multi-Party Account" by putting an X in the box next to its selection (*Id.* at p. 53; Pl's Ex. 2, the 056 account signature card).[11] Kearney and his wife, as directed by the bank, initialed next to the "Multi-Party Account" box.

USAmeriBank's check of the "Multi-Party Account" box was not inadvertent. Bank

---

adopted by district judge at doc. 106 finding that the deposit of entireties funds into non-entireties account does dissipate the status of the deposit). That question is left unanswered here as Kearney's counsel indicated that he was not raising this issue (doc. 363, at 26-27).

[10] The IRS check and a distribution check issued from Star Development, Inc. are the only funds deposited into the 056 account (doc. 289, pg. 71).

[11] Pl's Ex. 2 is appended to this report.

personnel admitted that a tenancy by the entirety account at their institution is a rarity. Instead, almost all the bank's husband and wife accounts are marked in Kearney's manner. Indeed, Kearney experienced this same corporate behavior when he attempted to open a subsequent TBE account at USAmeriBank.

This next TBE attempt occurred after the July 8 evidentiary hearing. Anticipating that the writ might be dissolved, Kearney instructed his wife to go to USAmeriBank and open a new TBE account (the "822 account") (doc. 363, pg. 56). If the Court dissolved the writ, he intended to transfer the money from the 056 account to the 822 account (*Id.*). To open the account, Kearney told Mrs. Kearney not to give USAmeriBank any other instructions other than that she wanted to create a TBE account (*Id.*). When Mrs. Kearney asked to open a TBE account, a branch specialist at the bank, Yazmin Caridad Tolzman ("Tolzman") understood this to mean that Mrs. Kearney wanted a "multiple-party account" (doc. 363, pp. 97-98).[12] As such, Tolzman printed a signature card with a computer-generated check on the "Multiple-Party Account" box (doc. 363, pg. 97; Def's Ex. 8, first signature card for the 822 account). After reviewing the first signature card, Mrs. Kearney

_____

[12] Tolzman testified that she had never before had a husband and wife come in to USAmeriBank specifying how they wanted to hold an account (doc. 363, p. 97). Instead, the parties would generally ask to open a joint account (*Id.*). Tolzman would not discuss with the parties how a joint account can be held and no party had ever requested her to open a TBE account before Mrs. Kearney's request (*Id.* at 96-98). When asked by the Court, Tolzman also testified that she did not remember receiving training with respect to the difference between a joint account and a TBE account and she never received training with respect to Florida's presumption that a husband and wife who hold a bank account together open an account as TBE (*Id.* at 106).

pointed out that it was incorrect because she wanted a TBE account (*Id.*). Tolzman, unfamiliar with setting up TBE accounts, spoke with another USAmeriBank employee, and then went back into the computer system to check the box for the option "Multiple-Party Account – Tenancy by the Entireties." (*Id.* at p. 99; Def's Ex. 9, second signature card for the 822 account). Tolzman printed a second signature card, which Mrs. Kearney signed and initialed (*Id.*). Mrs. Kearney took the second signature card to Kearney, obtained Kearney's signature on the card, and returned the card to USAmeriBank (doc. 363, p. 100). Later that day, Tolzman received a call from Cami Gibertini ("Gibertini"), senior vice president at USAmeriBank's Brandon branch, who told Tolzman that the second signature card was incorrect and that Kearney and Mrs. Kearney would be coming to USAmeriBank after hours to sign a third signature card, which a USAmeriBank employee had prepared in the Brandon office (*Id.* at pp. 101, 108). Gibertini eventually scanned a third signature card for the 822 account to Wendy Blankenhorn ("Blankenhorn"), an executive assistant to the Chief Executive Officer, who stayed after hours to allow Kearney and Mrs. Kearney to sign the document (doc. 363, pp. 111-113; Def's Ex. 10, third signature card for the 822 account). Blankenhorn testified that Tolzman placed "sign here" stickers on the third signature card indicating where Kearney and Mrs. Kearney should sign and when Kearney and Mrs. Kearney arrived, they signed the corrected third signature card (*Id.*).

I recognize that the Kearneys' second attempt to open a TBE account, if considered in isolation, would not satisfy Fed. R. Evid. 406's threshold (i.e., an organization's routine practice to prove that on a particular occasion the organization it acted in accordance with

13

that practice). But when this detail is considered with the testimony of USAmeriBank's representatives about the infrequency of TBE accounts, the relevancy is more apparent. Indeed, it is revealing and illustrative. For example, Gibertini testified that employees received training on how to prepare the signature cards, but that she did not know whether they are trained about the different ownership options (doc. 363 at 128). Indeed, she suspected that her bank's representative would not be expected to explain to a customer the basic differences in the ownership-type boxes. The representative would have to ask someone with more authority. *Id.* at 163-164. Nonetheless, if a husband and wife said they wanted to open a joint account, she would expect a representative of the bank to inform them of the available ownership options. Given she also admitted that in her experience a TBE account is "not a common ownership," her expectation seems dubious. *Id.* at 156-157. All this points to an institutional custom that picks for practically all husband and wife accounts the joint-ownership box as opposed to the one for tenancy by the entirety. And such a custom contradicts the statutorily created presumption for marital bank accounts.

From all this, the clear and convincing proof is that Kearney intended to denominate the 056 account as one held with his wife as tenants by the entireties. Regions, however, dismisses this proof. It claims that irrespective of Kearney's intention, the signature card ends the inquiry because that document meets the "otherwise specified in writing" language described in Fla. Stat. 655.79(1); *see also Wexler v. Rich*, 80 So. 3d 1097 (Fla. 4th DCA 2012). Kearney was obligated to follow the contract principle that "a party has a duty to learn and know the contents of a proposed contract before he signs it" and bears the burden

of making "a bad bargain." *Wexler*, at 1100-01 (citation omitted). Kearney, on the other

hand, argues *Wexler's* facts are distinguishable from his and that § 655.79, which did not

apply in *Wexler*, controls.[13]

The *Beal* court recommended to the Florida Legislature that it amend § 655.79 to

include the presumption that husband and wife accounts be considered as tenancy by the

entireties.[14]  Accordingly, in 2008 the Legislature amended the statute to include the

following language to § 655.79(1): "Any deposit or account made in the name of two persons

who are husband and wife shall be considered a tenancy by the entirety unless otherwise

specified in writing." *Beal,* 780 So.2d at 62 n.4; Fl. Staff An., H.B. 343, 3/11/2008. Section

655.79(2)'s language, however, remained the same: "The presumption created in this section

may be overcome only by proof of fraud or undue influence of contrary intent."  Whether

---

[13]  Relying upon *Wexler*, Regions indicates that the signature card, like the signed account agreements containing the option of a [TBE] and designating the accounts as "Multiple-Party Account[s] with Right of Survivorship" would satisfy the statutory requirement that an alternative form of account ownership be 'specified in writing.'" *Wexler,* 80 So. 3d at 1101.  However, unlike Mr. Wexler who told the bank employee that he wanted to open "joint accounts," the evidence here shows that Mr. Kearney requested a TBE account.  And, the evidence shows that Kearney, a knowledgeable businessman, understood that a TBE account would offer him protection.  He clearly intended to place his tax refund check in such an account.  As in *Wexler,* th Regions bank employees were unfamiliar with the details of a TBE account, and as a result failed to comply with Kearney's request that the 056 account be a TBE account.

[14]  *Beal's* recommendations were not limited to the Legislature: "Although we recognize that we cannot mandate that financial institutions provide affirmative choices to select each form of ownership on the signature cards, with an explanation of each type of ownership, we strongly encourage this practice.  Such a practice would minimize the likelihood of litigation and would put third persons on notice of the manner in which the account is held."  780 So.2d at 62-63.

the Legislature succeeded in clarifying the presumption's application is questionable.[15]

Regardless, what is clear from § 655.79(1) is that if a husband and wife want to avoid the tenancy in the entirety presumption, they must "expressly" choose another form of ownership in the "contract, agreement, or signature card executed in connection with the opening of the account …" And both *Beal* and *Wexler* essentially apply contract law with respect to the signature card, which is ultimately a form contract the bank presents to its customer. Kearney complains the card is confusing for determining the form of ownership. For such a proposition, the usual contract principles apply. Whether a contract is ambiguous is for the court to decide. *Douglass v. Buford*, 9 So. 3d 636, 637 (Fla. 1st DCA 2009). On that score, Florida has long followed the rule that:

> "[i]f a written contract is ambiguous or obscure in its terms, so that the contractual intention of the parties cannot be understood from a mere inspection of the instrument, extrinsic evidence of the subject matter, of the relations of the parties to each other, and of the facts and circumstances surrounding them when they entered into the contract may be received to

---

[15] For an in depth discussion of the treatment of "presumptions" in Florida see *Universal Ins. Co. of North America v. Warfel*, 82 So.3d 47 (Fla. 2012). It would seem that the presumption § 655.79 creates is one covered by § 90.304 of the Florida Evidence Code because the statutorily created presumption implements a particular public policy. Thus the presumption remains in effect even after rebutting the presumption and the fact-finder must decide if the evidence is sufficient to overcome the presumption. *Id.* at 54. But if § 655.79 is read literally, the presumption would only come into play if the "other writing," *i.e.*, the signature card, reveals a couple chose a tenancy by the entireties form of ownership and then claimed later a different intention. Their written preference ("specified in writing" as tenants in the entireties), which the presumption embodies, could then only be overcome by "proof of fraud or undue influence, or clear and convincing proof of a contrary intent." § 655.79. Whether the amendment implemented the public policy, particularly when the "other writing" fails to explain the differences in the choices of ownership, is a different question.

enable the court to make a proper interpretation of the instrument.

*L'Engle v. Scottish Union & Nat'l Fire Ins.*, 37 So. 462, 467 (1904); *see also Bernal v. All American Investment Realty*, 2009 WL 586010 *6 (S.D. Fla. 2009) (applying *Beal* and finding that because the signature card was illegible, no "express designation" could be determined and an evidentiary was required). "The central concern in interpreting contracts is the intent of the parties." *Travelers Ins. Co. v. Bartoszewicz*, 404 So. 2d 1053, 1054 (Fla. 1981).

On this record, having carefully examined the signature card, I cannot say the Kearneys expressly chose the joint-tenancy box. In short, the form is ambiguous and confusing as to the intended form of ownership. The card has four different boxes on the far left side, and one single box in a middle column. Directly beneath the box in the middle of the card is the phrase "Tenancy by the Entireties." It is difficult to determine whether this phrase belongs with the option for "Multiple Party Account" that is to its left, or with the identical phrase "Multiple Party Account" directly above it. *See appendix*. More importantly, I find that there is clear and convincing proof explained above that when Kearney and his wife opened the 056 account, they intended to open a TBE account. Accordingly, I find that his claim of exemption applies.

### 2. Platinum Bank writ

Platinum Bank's answer (doc. 249) to the Regions's writ listed four accounts owned by Kearney:

Account 6601                        Owned by Clay W. Kearney or Bing Kearney

17

| Account 7902 | Owned by Clayton W. Kearney or Bing Kearney, Jr. |
| Account 3201 | Owned by Bryan G. Kearney or Bing Kearney |
| Account 2401 | Owned by Bing Kearney or Carlie Kearney |

Regions took issue with Platinum's answer and replied: "the Answer does not delineate the nature of the ownership, the relation of Clay W. Kearney, Bryan G. Kearney, and Carlie Kearney to Kearney, and thus the Bank disputes the classification of the Garnished Accounts pending discovery relating to the same." *See* doc. 261. Regions, however, failed to satisfy the notice requirement imposed by Fla. Stat. § 77.055, namely: that Regions "shall serve by mail [on the defendant and any other person disclosed in the garnishee's answer to have any ownership interest in the deposit, account, or property controlled by the garnishee] the following documents: a copy of the garnishee's answer, and a notice advising the recipient that he or she must move to dissolve the writ of garnishment within 20 days after the date indicated on the certificate of service in the notice if any allegation in the plaintiff's motion for writ of garnishment is untrue." *Beardsley v. Admiral Ins. Co.,* 647 So. 2d 327 (Fla. 3d DCA 1994) (finding creditor should have sent notice required by Fla. Stat. to other person disclosed in garnishee's answer to have an ownership interest and remanding for compliance with statutory notice provisions); *Antuna v. Dawson,* 459 So. 2d 1114 (Fla. 4th DCA 1984) (finding creditor's failure to adhere to Chapter 77 notice requirements denied joint bank account depositor's right to be heard). Consequently, the "persons disclosed" in Platinum's answer were foreclosed from exercising their rights to move to dissolve the writ. For these reasons, the Platinum writ should also be dissolved. *See Akerman Senterfitt & Eidson, P.A.,*

*supra,* 2013 WL 4734574, at *2; *Marquez v. BlueCare Home Health Svcs., Inc.*, 116 So. 3d 563.[16]

### D. Conclusion

Based on the foregoing, it is hereby

RECOMMENDED

1.  Kearney's  motion to dissolve the USAmeriBank and Platinum Bank writs of garnishment (doc. 255) be granted.

2.  Kearney's claim of exemption (doc. 219) as to the 056 account at USAmeriBank be granted.

IT IS SO REPORTED at Tampa, Florida on October 18, 2013.


MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

---

[16]  In his Written Submission of Closing Argument, Kearney indicates that as of the date of its filing, September 6, 2013, none of the co-owners of Kearney's USAmeriBank and Platinum accounts had been notified of USAmeriBank's Platinum's answers to the writs or that they must move to dissolve the writ within 20 days of service of the notice as required by Fla. Stat. §77.055.  *See* doc. 373, ¶¶5, 7.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. § 636(b)(1).

cc:    Honorable Elizabeth A. Kovachevich
       Counsel of Record

USAmeriBank
113 E Whiting ST
Tampa, FL 33602

Member FDIC

OWNERSHIP OF ACCOUNT - CONSUMER PURPOSE (select one and initial)

- [ ] Single-Party Account
- [X] Multiple-Party Account
- [ ] Multiple-Party Account - Tenancy By the Entireties
- [ ] Trust-Separate Agreement Dated: ____

RIGHTS AT DEATH (Initial one and below)

- [ ] Single-Party Account
- [ ] Single-Party Account With Pay-on-Death Designation (name beneficiaries below)
- [X] Multiple-Party Account With Right of Survivorship
- [ ] Multiple-Party Account With Right of Survivorship and Pay-on-Death Designation (name beneficiaries below)
- [ ] Multiple-Party Account Without Right of Survivorship

NAME OR NAMES OF BENEFICIARIES

OWNERSHIP OF ACCOUNT - BUSINESS PURPOSE

- [ ] SOLE PROPRIETORSHIP    [ ] PARTNERSHIP
- [ ] CORPORATION    [ ] FOR PROFIT    [ ] NOT FOR PROFIT
- [ ] LIMITED LIABILITY COMPANY
- [ ] ____

BUSINESS
COUNTY & STATE
OF ORGANIZATION:
AUTHORIZATION DATED: ____

DATE OPENED 12/01/2010    BY Kyle Berry - DT TAMPA
DEPOSIT    [ ] CASH    [X] CK
HOME TELEPHONE # 
BUSINESS PHONE # 
E-MAIL 
EMPLOYER SELF EMPLOYED
Name and address of someone who will always know your location:

BACKUP WITHHOLDING CERTIFICATIONS

TIN:
[X] TAXPAYER I.D. NUMBER - The Taxpayer Identification Number shown above (TIN) is the correct taxpayer identification number.

[X] BACKUP WITHHOLDING - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

[ ] EXEMPT RECIPIENTS - I am an exempt recipient under the Internal Revenue Service Regulations.

SIGNATURE: I certify under penalty of perjury the statements checked in this section and that I am a U.S. person or other U.S. person (as defined in the instructions).

X ~signature~ BING KEARNEY Jr.    12/01/2010
Signature Cook-Fl,    (Date)
Sales & Systems, Inc.
United ©Amer Financia Services © 1992, 2009

ACCOUNT NUMBER

ACCOUNT OWNER(S) NAME & ADDRESS

BING KEARNEY Jr.
TONYA NUNFER-KEARNEY

| TYPE OF ACCOUNT | [X] NEW | [ ] EXISTING |
|---|---|---|
| | [ ] CHECKING | [ ] SAVINGS |
| | [X] MONEY MARKET | [ ] CERTIFICATE OF DEPOSIT |
| | [ ] NOW | |

This is your latest and:
[X] Permanent    [ ] Temporary    account agreement.

Personal Money Market
Number of signatures required for withdrawal 1
FACSIMILE SIGNATURE(S) ALLOWED    [ ] YES    [X] NO

[ X _____ ]

SIGNATURES - The undersigned certifies the accuracy of the information he/she has provided and acknowledges receipt of a completed copy of this form. The undersigned authorizes the financial institution to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as indicated. The undersigned also acknowledges the receipt of a copy and agrees to the terms of the following agreements under disclosures.

[X] Terms & Conditions  [X] Truth in Savings  [X] Funds Availability
[X] Electronic Fund Transfers  [X] Privacy  [X] Substitute Checks
[ ] Common Features  [ ]

(1) [ X ~signature~ ]
BING KEARNEY Jr.
I.D. # Redacted _____ D.O.B. Redacted

(2) [ X ~signature~ ]
TONYA NUNFER-KEARNEY
I.D. # Redacted _____ D.O.B. Redacted

(3) [ X ]
I.D. # _____ D.O.B. _____

(4) [ X ]
I.D. # _____ D.O.B. _____

[ ] Convenience Account Agent filing a Multi-Party Account

[ X ~signature~ 12/14/10 ]
I.D. # _____ D.O.B. _____

Appendix